Good morning ladies and gentlemen. Our first case for this morning is Daniel against the Office of the Sheriff of Cook County. Mr. Fishnesky. Good morning your honors. May it please the court. We have a Monell case here. Mr. Fishnesky has been in the office of the Sheriff of Cook County for some time. But in 2010, he faced problems with the Cook County system for providing medical care. Three things we've identified. Scheduling, medical records keeping, and the grievance procedure. Those things came together. They're widespread practices, as we'll talk about in a moment. There's evidence of that, both from doctors and Cook County jail personnel, as well as the sheriff's office. The DOJ investigation. Let's look at how this unfolded. Mr. Daniel was playing basketball on April 24th and had a very bad break of his arm. He was seen by an immediate care physician who said he needs to see an orthopedic specialist ASAP, within a week. So I take it you're not making any claim about the 16 days or so that elapsed from the break to when he finally sees the orthopedist the first time? I think it's important to show the pattern. Even though, I was going to say, it took two weeks instead of one week. No harm, no foul. But strike one. It was the first time we see in Mr. Daniel's case that something bad is happening. It's basketball season and it's baseball season. So on it goes. He actually does get seen 16 days later, as you say, on May 10th. And Dr. Amasia has a treatment plan. Three weeks in a long-arm cast, two to three weeks in a short-arm cast, and it should be off. It's a standard treatment plan. I'm sure it's in the records. And he gets his long-arm cast on May 10th. He's supposed to come back three weeks, June 1st. He does come back and he does get his short-arm cast. So, so far, so good. But then what happens? He's supposed to have an appointment with an orthopedic specialist on June 22nd and get his cast off. That was the treatment plan. Instead, that appointment is bungled. He doesn't see an orthopedic specialist. He's brought to a general practitioner. All we know is the initials LM. And that general practitioner clearly doesn't know what the treatment plan is. This doesn't do anything to get him to an orthopedic specialist. Writes only in his notes, awaiting ortho. So I have two questions for you. One is, what is the evidence? I mean, he starts having, you know, his fingers are numb and his hand's bad and he winds up with permanent damage from this. What's the evidence that the delay is there? That's sort of question one. And then on a somewhat different topic, you discuss a lot the DOJ evaluation of the Sheriff's Office, the Rule 8038A, and I want to know how important the DOJ letter is to your case. I think the DOJ letter adds a lot of weight, but it's not critical. So just going right there, let me answer your first question first. If I understand your question, what's the evidence that the delay is there? What's the evidence of harm, really, from the fact that this cast sits on his arm for a couple of months instead of being taken off in three weeks? We went out and hired, you know, pro bono counsel, we went out and hired an expert, Dr. Fetter, who saw Mr. Daniel and evaluated him and diagnosed him as having partial permanent loss of use of his hand. He can't make a fist, for example. And he put in his report his conclusion that it was having the cast on too long. And basically the cast was on twice as long as it should have been. It's standard procedure not to have it on that long. And it causes a deterioration of the bones and the tendons when the cast is left on too long. So that's the osteopenia he winds up with? Right. I mean, for purposes of getting through summary judgment, I think it's pretty clear we have evidence in the record, an unopposed expert witness, who's corroborated by the treating doctors, who all say, yes, you shouldn't leave the cast on that long. That's the wrong thing to do. So to answer your other question about how important the DOJ letter and so forth is, let's talk about what we have without that. Okay? So just to finish the chronology, it's the June 22nd appointment, which is the real key. There's a scheduling bungle, Dr. LM, whoever he is, a general practitioner, apparently doesn't know the treatment plan, does nothing, and so Mr. Daniel is not seen again until August 3rd. But didn't he say something in addition that should come off? No. All that's in the note is awaiting ortho. I'm talking about the GP. I'm talking about the GP, whose initials are LM, on the June 22nd appointment. He doesn't say the cast should come off. He says awaiting ortho. Okay. I misunderstood that then. I thought somebody observed that it should come off. You're right. On August 3rd, Dr. Baker, who's also a GP, so he still hasn't seen an ortho, says, oh my gosh, this cast should come off. I'm scheduling this guy for ortho tomorrow. That appointment doesn't happen. Mr. Daniel gets back in front of Dr. Baker on August 10. Dr. Baker says the schedule did happen for August 9th, and security didn't bring him. So he still hasn't seen the ortho. Dr. Baker, frustrated, testified in his deposition, frustrated that the scheduling system doesn't work, because he had called Laura and scheduling to make this happen, and it still didn't happen. He bypasses the system, calls jail personnel directly and says, make sure he's here, and gets them there August 12th, and finally the cast comes off. So that's the chronology, and it's clear that it was the scheduling, the medical records, bad keeping, that was the direct cause of the delay, and we have an expert doctor who says that's why this guy was injured. In the meantime, Mr. Daniel has filed a couple of grievances, right? That's the third point. Mr. Daniel is not shy. He filed a grievance every time he didn't make an appointment. And what I think is really critical here is the third prong. We took the deposition of John Mueller, who's the deputy director of inmate services, testified that the grievance that inmate services was in charge of making sure grievance procedures were followed. And he testified to an unconstitutional grievance procedure. What he said was a medical request grievance for improper medical care could sit for 30 days. That's procedure. No daily checking to see if there's something that's critical. No weekly checking. No one person who's involved who's supposed to oversee this or check it. I mean, on its face, that procedure for medical grievances can't possibly be right. I'm having, I guess, a bit of a mental block on this. Partly because we see a lot of cases in which prisoners sue the prison officials in the grievance administration process, okay, saying you didn't handle my grievance properly. And I certainly understand how grievance procedures fit in and help correctional officials defend cases brought under the Prison Litigation Reform Act. But is there an independent constitutional violation that happens because a grievance is not handled correctly? Or is it – explain to me where there's an unconstitutional grievance procedure. Sure, you have a system of medical care for inmates. Both, you know, pretrial detainees and prisoners who've been sentenced. Was he a pretrial detainee this entire time? He's still a pretrial detainee. That's a long time. It's a very long time, Your Honor. I do not know the circumstances. You don't know why he's just languishing. Okay, that's – go ahead. But that said, so the system for the prisoner has to work in some way. If there are problems with the scheduling system, if there are problems with the medical record-keeping system, a grievance procedure is your backup to make sure that things happen. And here you had a grievance procedure that was designed not to work. Medical care is time-sensitive. This is a good example of medical care. Well, I mean, it could be anything else, though. If it's really a complaint about the grievance procedure, I guess I have a similar question to Judge Hamilton's. To what extent is that just supporting your institutional Monell argument that the medical process wasn't working? And to what extent there's a bad grievance procedure. It could be bad because somebody's attacked by a cellmate, or it could be bad because the medical care has fallen apart, or it could be bad for any number of other reasons that we typically see in prison cases. I think it's the three of them together. All three of them create – you've got a scheduling system that's not working, a medical record system that's not working. Right, but his injury is the medical injury. If I understand you right, yeah. To go back to your no harm, no foul comment earlier, bad handling of a grievance if nothing bad has happened to a particular detainee physically is not a constitutional violation. But if I understand what you're telling us, it is that certainly with a system of this massive size in the Cook County Jail, providing effective medical care in essence requires effective bureaucratic procedures, including safety nets and backups. And the grievance procedure could be or should be part of an effective backup system. Sure. And you're saying this one's designed not to work. What were the grievances? The grievances were the medical care system's not working. Help me. My hand hurts. I can't move my fingers. So here's another question about it, though. Your opponents say, well, you know, maybe it didn't work for Mr. Daniel, but how do we know, you know, that it was globally bad? You know, why is it a Monell claim as opposed to simply some more specific claim? Right, and that's why we took the depositions of the doctors and of John Mueller Inmate Services. The three doctors we took the depositions of, Drs. Baker, Major, and Capotes, all testified that they generally don't know whether a progress note's going to be in the record or not because it was a paper system. And so we didn't ask them just about Mr. Daniel. We said, do you get progress notes? Sometimes, sometimes not. We asked them about scheduling. Dr. Baker was especially strong on this. He said, you know, I can do all kinds of things. I can call over to scheduling. I can try to drive the guy over there. I mean, there's only so many things you can do. And in this case, he specifically had to bypass the scheduling system. Cermak ran the, it was Cermak's scheduling system. He's a doctor at Cermak. He called Laura, and it didn't work. So he's like, okay, I'm going to go straight to the jail and bypass this because it's not working. And it wasn't just here. He said, it just, you know, I have a terrible time with this. So we have the three doctors testifying to the medical records progress note problem, to the scheduling problems, which are specifically what happened here, but being a widespread issue. And we have John Mueller testifying to a system that I think on its face doesn't work in a medical context. And we have evidence that even that system wasn't being followed because grievances were answered longer than after 30 days. Now, do I understand Mr. Mueller's testimony? I understand he's your 30B6 person, so he should be somebody able to speak to this. Do I understand that they didn't track by inmate? Did they just sort of threw these things all into the report? I mean, I'm trying to visualize what this system looks like. You get a computerized sheet once a month that says, here's a list of the complaints that were made, when they were made, whether they're answered or not. So somebody looking at that report at the time it's made can say, okay, here's one that's 29 days old. Here's one that's two days old, whatever. There's no specific person assigned to do that. But there's nothing that tracks, you know, grievance number two was filed on this day and a response was made on that day and it was resolved on some other day? As far as we can tell, no. So, you know, that system, if you've got a grievance, it would be nice if you knew what day the report was done, right? Because if your grievance is the day after the report, you've got 29 days before anybody cares. That's why I say, on its face, in a medical context, it just can't work. And it certainly didn't here. Can I ask you a couple of questions about a couple of the pieces of evidence that are being disputed here? Sure. With respect to the 2010 monitors report, that was submitted to whom? That was submitted to the court and the parties. The court, a judge of the Northern District? Yes. Do you know who has it? We have it. Okay. But it's on PACER. Okay, we'll put that aside. I've got to say, the notion that that is a report of presence since impression struck me as a pretty far stretch as a matter of evidence law. But I don't understand why it wouldn't also fall within the 8038. It does. I was actually thinking about that as I was preparing last night. It's a report of an investigation. He's a court-appointed investigator who's supposed to go and see how the ordered remedies are happening. And in any event, I assume it would take about a one-sentence affidavit from him for summary judgment purposes to say, my report from 2010 is true, right? Right. So I'm not sure why we're having this huge fight about the admissibility of it, but be that as it may. On the agreed order, why is that not a party admission? For a limited purpose, I would say it's a party admission, because they say they dispute some of the conclusions, and they make a point of that, so we can't use it as race judicata. But for the limited purpose. I'm not suggesting it's race judicata or conclusive. I'm just suggesting it's admissible evidence. I think it's admissible as an admission. Admissible, and we're focusing on we agree that these remedial measures have to happen, that one sentence, right? Correct. And now for your question about the importance of the DOJ stuff. I don't think we need it. I think we get past summary judgment with the doctor's testimony and Mr. Mueller's testimony. But it's certainly dead-on-point evidence. It's very powerful evidence. It's an investigation by a public agency that has the public trust and is carrying out that mission. They've got access to inmates, to the record-keeping, to the CIRMAC personnel, to the court personnel that no inmate or no big law firm doing a probe on a representation could ever have. It is the most probing evidence you could find on this. The trial court said the 2008 DOJ letter was old. Well, no. 2008 DOJ letter pointed out all the problems. You take it together with the agreed order in May of 2010 that the problems needed to be remedied. Clearly, they hadn't. And Dr. Shansky's report in June of 2010, right dead in our time period, right in the critical time when Mr. Daniel missed his appointment. And Shansky says it's still a mess. If DOJ had come in and done this study, how long did that take, by the way, the DOJ study? I believe it took like a year. If they'd come in and said, oh, we see a few minor problems but nothing systemic, that would be admissible too? Sure. I imagine if they came and said, this is a great system, that Cook County and the other defendants would be here saying, that is really admissible. It shows that there's no widespread anything. How long do you think that 2008 letter will stay relevant? Obviously, the Cook County Jail is a frequent customer of ours in this courthouse, and it's a major institution within the Seventh Circuit. Well, I think it's relevant until there's evidence that the remedies have taken place. In this particular case, you have direct evidence that they haven't at precisely the time when Mr. Daniel's injury occurred. Well, if you'd like to save a little bit for rebuttal, that would be a good thing to do now. Thank you, Your Honor. Not sure how to pronounce your name, Mr. Zechin? What? Zeki. Zeki. Okay. You're not the first, Your Honor, who's not been able to handle this. I appreciate the help. May it please the Court. My name is Anthony Zekina. I represent the defendant, Appalachian, Appalese, in this case. The district court did properly grant summary judgment in the defendant's favor in this case, and as Mr. Wisniewski did articulate, there are three bases upon which plaintiff brought his claims. I'd like to point out to the Court first that there's no individual claims, so there's no claims that anybody did anything wrong. They were all rooted in Monell. These are definitely Monell claims. We understand that. And as this Court knows that, there needs to be a showing by the plaintiff. You know, the put-up or shut-up has been repeated often by this Court for the plaintiff to produce the evidence to meet his burden of summary judgment. In this case, our position is that they simply haven't done that. What else could they do? You know, you've got this Department of Justice study, which looks to me to be squarely in the wheelhouse of Rule 8038. I don't know why some committee note that says, you know, maybe sometimes there's a problem, supersedes the actual language of the rule. So you've got that. Even if you didn't have that, you have testimony from employees of the system, the doctors, saying that these things just don't work. And you have a man who happens to have been injured by this systemic failure. You know, he's not saying that any of these poor doctors who were working in this system individually did anything wrong. That's why it's a Monell claim. But it seems to me extreme not to say that there's enough to support a trial. Well, if I can go back to your first question or your first statement about the Department of Justice letter. The committee notes the importance is it just instructs what the courts are to consider. And I think that the importance, and as the... And they're presumptively admissible. But I don't see what circumstances indicate a lack of trustworthiness when the Department of Justice, our national law enforcement agency, if you will, comes in and conducts an investigation. Well, I think the manner in which this was conducted, what gives most pause, I think, is the fact that... Why? What are you going to do if you don't actually ask the people who are in the place for their report or for their observations? You certainly could, Your Honor, and that's what they... The way in which it was done, though, that's what poses the problem, which indicates... Explain to me exactly how it was done and how you think it should have been done. Sure. There was, in the letter itself, there were interviews conducted of detainees. And you've just agreed with me that there's no problem with interviewing detainees. No, of course not, Your Honor. All right. So that part's fine. Sure. And what happened is that the interview process that was conducted was anonymous. Pseudonyms were used in some cases. And why do you suppose that was? Well, I assume that it was fear of retribution, perhaps. Right, which could happen. I don't know why that undermines the reliability of the Department of Justice, as they may have thought they were getting more reliable information by keeping pseudonyms so that the inmates wouldn't shade their stories because of fear of retribution by the guards or the institution. And then the follow-up to that, though, is that these were also unverified, unsworn. It was a conversation, and recording that conversation and reducing it to writing, it wasn't something under oath. Investigations rarely are. I mean, there have been investigations of companies who have had problems with sexual harassment in the workforce. Investigation doesn't suggest that you're dragging people in front of a grand jury for testimony under oath. But with regard to the magnitude of this investigation, it was, in fact, I believe it was 18 months the Department of Justice was at the jail, and Judge Kendall is the judge presiding over the case. That strikes me as a factor in favor of its reliability, actually. Well, again, Your Honor, there was an opportunity for the jail or for the county to even vocalize any dispute as to these findings. Right, and nobody is trying to suggest these findings are conclusive at this point. Simply, they're being offered as evidence, right? Right, and I think, though, that is what exactly the concern is. But you would have plenty of opportunity. First of all, the day it appeared, the county would have had an opportunity to say, we're going to respond to this in a couple of months after we've had a chance to digest everything in the report. And certainly at a trial, as Judge Hamilton says, there's nothing binding about this. It's just evidence. You're entitled to say, no, we responded within 10 days of every grievance, and here's our documentary evidence that we did that, and we're perfect, or, you know, whatever you want to say. Well, I think in this case, despite counsel's statement that they don't really need the DOJ anyway because they have admissions from doctors and testaments from doctors, it's incorrect, I believe. Let me ask the question the other way, though. Is there any way, if the DOJ letter comes in, is there any way we could affirm summary judgment? I still think that there's nothing to establish. That's one component, but there still is a noticeable gap in the proof here that there's not a single bit of evidence from any other detainee at the jail that they suffered any harm from either the medical records situation, the scheduling system, or the grievance procedure. But that's just luck. I mean, you know, maybe that means other people couldn't get damages, but if they're constitutionally defective policies, you know, suppose people driving prison vans invariably go 88 miles an hour on the Stevenson. Well, maybe you're not going to have an accident. But if you do have an accident, then there's going to be a problem. Well, I disagree with the statement made by counsel that the procedure is infirm on its face. Actually, the testimony of Mr. Mueller was that it will back up for a second, Your Honor. To answer your question, there certainly is tracking by name because how could you follow up to let someone know what the status is if you didn't know who they were? So that was a misstatement. There is a tracking by name. The system can ñ there's no issue here with regard to the grievances being referred to CIRMAC for a response at a time matter. But Mr. Mueller says there's no specific person designed to track whether there's been a response. There are no alerts or notices if there hasn't been a response within 30 days. There are no daily or weekly reports. There's just this one monthly report. Nobody checks on outsiding grievances, and all he's able to say is a majority are answered on time. We don't know what he means by that, but it doesn't mean everything. Right. Well, in context, Your Honor, this is the ñ when Mr. Mueller said there was not a person assigned, that is to say there's not a point person. He said a staff member of program services. So it's not like Anthony Zakin is responsible for going and checking to make sure there's grievances that are timely responded to. Instead, he was saying that it's the responsibility of the staff of inmate services. With regard to the actual follow-up, there is follow-up that does take place, and as he testified to, it's either if there's no response or a delay in response, there is a follow-up. But the question is are there ñ maybe you can read that. We have to read this evidence in the light most favorable to the plaintiff since we're on summary judgment. And that, I think, makes a difference here. Could I ask you about the DOJ letter again? Because we've decided other cases decided by other judges in the Northern District of Illinois in which that exact letter has been admitted into evidence, correct, or has been used as evidence to oppose summary judgment. There's been ñ I believe there's been some case law, but I don't ñ Dixon.  Yes, and I am aware of Dixon. Dixon is one. In the district courts, we've got some district judges apparently admitting it and others doing what the district judge did in this case and exercising discretion to keep it out. And let me just throw out an idea for you because I'm troubled by it. You make the argument that I would expect you to make, that these are evidentiary questions that are left to the discretion of the district judge. But it strikes me as both unseemly and arbitrary to have different district judges in essentially parallel cases reaching opposite conclusions on a critical piece of evidence that may well be decisive for summary judgment. And I'm wondering whether it is in time, in essence, for this court to maybe exercise the discretion, at least as to the 8038 question. Obviously, there would remain questions about relevance and how close the fit is between the content of that letter in an individual case. But I'm really troubled by the idea that in half the cases it will be kept out and summary judgment will be granted and in half it will be kept in. And we would affirm all those. Well, obviously, Your Honor, and the Seventh Circuit can do whatever they think is appropriate at this time given the state of the opinions. I think that that's one of the values or whatever you want to say, entrusted to the district court to exercise their discretion. Believe me, I've been there and I'm 99% in agreement with that. But this situation is extraordinary. Okay, Your Honor. I'm not sure why this is any different than any other cases that are brought under Monell. Same piece of evidence, critical piece of evidence, inconsistent results or decisions about admissibility with decisive results for the cases. I thought you meant with the facts of this case, not the general propositions that it stands for. Well, part of it is, to what extent did Judge Alonso's decision about this report turn on a reading of the evidentiary rule that was too narrow? Obviously, if a judge bases a decision whether to admit or exclude evidence on an incorrect interpretation of a rule, there you have a legal question that's appropriate for this court to take a look at and maybe that's what's yielding these troubling, inconsistent results in the district courts. I mean, it's the same jail and the same study and the same set of problems, so it really doesn't make any sense that the report is either admissible for the truth and then let the case proceed. Obviously, there's more to this case than just this one report. Or it's admissible only for some kind of notice or non-truth purpose. Well, one thing, if I could bring up, and I know Your Honor is the author of Dixon as well and I'm familiar with the case. I think in that case, when the summary judgment was reversed, I think there was more to that case in the record, and obviously you know it better than anyone. But there was also expert testimony in that case about the system that was in place. Well, and they have testimony here. They have the doctor saying, you know, this is very random, you know, the participants. I believe if you looked at the testimony of Dr. Baker in context, he was frustrated with Mr. Daniel not getting his cast off. He made no statements, nor has there been any additional testimony induced or any evidence to support that this, in fact, was a problem that went beyond Mr. Daniel. I think that that was an overstatement of what Dr. Baker testified to. Therefore, I don't believe that there's, in fact, a showing by the plaintiff that this went beyond Mr. Daniel's specific issues with the scheduling process. Are you saying this is an isolated incident? I am. Or it distinguishes itself from all of these others? I wouldn't. Because the impression I have is that your defense is that they went through a lot of procedures and it was bungled along the way and he had maybe a serious thing and somebody could have addressed it. It seems to me like when one doctor says, well, you know, this cast really needs to come off, I might have just said take it off because that's not a big deal. But I still see this thing trailing through, and we're talking about deliberate indifference, right? That's correct. And that's what we're trying to show is there's some bungling and it looks to me like a large bureaucratic place, to say the least. It's got to be something. In fact, he's still a detainee. I understand. Wasn't there a change in getting a much more efficient electronic review now? You're correct, and I appreciate the fact that the distinction between negligence or gross negligence and deliberate indifference, which the plaintiff must show, is really the issue here, and you're right, though. There was a transition from handwritten medical progress notes to a computerized system, and by all accounts it improved the system dramatically. Although it hadn't been done yet as of the time of this case. So what I'm focusing on is in part on page 16 of the opening brief. This is what Dr. Baker had to say, which goes beyond just Mr. Daniel. He's saying, how are appointments scheduled? Forwarding along pieces of paper. If the note indicated that Mr. Daniel had an appointment, the doctor assumed the appointment was made, but the doctor didn't know exactly when it is, and there was no way for a physician to know when or if an inmate, that's not just Mr. Daniel, an inmate, was scheduled to see a specialist, and then Dr. Capota says something like that, and then Dr. Baker says, and I hear this as just sort of frustration and a little bit of, you know, I don't know, complaint. I mean you can make phone calls, you can give them papers, you can write movement envelopes. How many things can you do? And a lot of that is not just the system fell apart from Mr. Daniel. Well, I think, though, the problem is that, again, if I can go back just briefly to address your concern about the DOJ learning inconsistency. Essentially by admitting it, and what it seems like it's being done is that they're saying the DOJ reached these conclusions, so we're stripped of our burden of producing evidence to sustain our claim. And I think what it's going to do is allow the shortcut that doesn't provide us with the ability to, you know, hold the plaintiff's feet to the floor. What do you mean stripped of your? Well, I don't understand that point because the DOJ investigation is better equipped, better funded, has greater access to relevant information than any institution or individual I can think of outside the jail itself. And it sounds like you want to litigate that investigation to force it to be replayed in every case. Of course, in which each case you lose, you'll be required to pay attorney's fees. I think we'd be foolish not to take advantage of that as a starting point. Again, not suggesting it's conclusive. And I want to clarify my position because I don't think I made it clear enough. I apologize for that, Your Honor. I'm not saying that we should re-litigate the DOJ letter. All I'm saying is that if it's considered, it should be considered in conjunction with actual evidence presented to sustain their burden at summary judgment. And here, all it would take was perhaps some documentation like there's, you know, 85 grievances a month that are not timely responded to. There are 100 missed or canceled appointments for medical personnel. None of that is here, so we have no idea what the extent of these alleged unconstitutional systems are. And that's something that could have certainly been borne out in discovery. This case is, as you know, it was filed in 2011, so it's been around for a long time. There's simply not the evidence to sustain their burden even at summary judgment. Okay. Do you have anything else? I'm not sure how much time I used. I didn't really get much into my outline. You probably have about three more minutes. You may use them as you wish. Well, Judge, I guess just to go over, and I don't want to beat a dead horse here, but I just think that in this case there's simply, as Your Honor pointed out in Dixon, that you need to have not only a systemic situation, but also a knowledge to the policymaker and ignoring that. I don't think that was shown here even at summary judgment. They didn't put forth any evidence to show that, in fact, this was something that was on a widespread or systemic level. Why isn't the DOJ report at a minimum? Even Judge Alonso thought that it was noticed to everyone from Sheriff Dart on down that somebody thought there were a lot of problems at the jail. Well, that would be the problem. What exactly is that notice of? Every single thing listed in 98 pages provides notice to the... Yes, as a matter of fact. But in that case, then, I think it's incumbent on plaintiffs to then bear out those claims. Ask Sheriff Dart whether he read the report? I mean, that doesn't make any sense. No, that's not what I meant either, Your Honor. I'm talking about just when, through the course of discovery, producing evidence. If there had been evidence produced in conjunction with the DOJ, there might be a different result. But in this case, the plaintiff relied almost exclusively on the DOJ letter. And I respectfully disagree with the interpretation of the doctor's testimony. But I think that in this case, really, there was just nothing to show that Mr. Daniels' plight extended to anybody else in the jail. So we look at the docket in this building and we find 100 isolated instances of failure to provide timely medical care. Right? Okay. Okay. I mean, that's... These cases have a kind of cumulative weight, frankly. Sure. So... I assume, by what Your Honor is saying, that that would be also further evidence of notices that... I don't think anything beyond the letter is needed. Okay. I just want to... In the 2010 report. But I'm talking... I'm troubled by your suggestion that this is simply an isolated incident on this record, and where the defense seems to be that this and 100 other cases are all just isolated incidents, given the DOJ evidence of systemic problems in providing just a minimal level of humane care in the jail for people who have been found guilty and people who are just being held because they have been charged and are unable to come up with bail. Which is, by the way, if that's this case, it's a 14th Amendment case, I'll say, to be picky. It's not an 8th Amendment case yet. And we've always said that if it violates the 8th Amendment, it certainly violates the 14th, but it's conceivable that pretrial detainees who have never been adjudicated guilty of anything, if anything, they get better care. I agree with the court on that. Judge, just to make one final point. I don't mean to suggest that the other cases that are pending on this court's docket are in any way unimportant. It's just that that was not something that was even offered by the plaintiff. In terms of litigating the summary judgment, it wasn't something that they had brought up. So I don't want to be disrespectful of your position, and I don't want you to think I'm being disrespectful of you either. I do not have that impression, sir. Thank you. I have nothing further. All right. Thank you very much, Mr. Zakin. Anything further, Mr. Pyshineski? Thank you. What does he have? You have two minutes. Just a couple points. Thank you. Just one point, to be clear, on the tracking. The monthly report did, of course, have the name of the detainee and an ability to see how many days it had been since the grievance had been made. I didn't mean to suggest that it was impossible for that once-a-month report to be used to track. My point was just that once-a-month just doesn't work. For medical issues in particular. For medical issues. It might work for other issues, but certainly not for medical issues. The other point I want to address is the point about the use of the DOJ letter and the inconsistency of the district courts in applying Rule 8038. I agree that it should not be the luck of the draw which district judge you get as to whether or not the DOJ letter comes in. I think the answer is found in Dixon and how to use that, in that if there's evidence that it's still relevant for the particular detainee or prisoner that is at issue, like in Dixon there was evidence that the remedial measures hadn't taken place yet. Same thing here. There's evidence that the relevant remedial measures hadn't taken place yet. So you can contain. There's the relevance limitation. But in terms of 8038, we still would have to deal with this issue of the ordinary abusive discretion standard that we apply. If a district judge approaches a discretionary question with a misunderstanding of the applicable legal rules, we've often said that will produce an abuse of discretion. But this is the inconsistency here is very troubling. I think that, Senator, could you clear it up? Thank you. All right. Thank you very much, and we appreciate the efforts of you and your firm, helping your client and helping the court. Thanks so much. And thanks as well to the state.